**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

MARY SAYAGO; LEONARDO SAYAGO;
CYNTHIA LEWIS; individually and on behalf
of all others similarly situated                                      PLAINTIFFS

v.                                    Case No.: 8:11-cv-02009-VMC-MAP

WELLS FARGO BANK, N.A.                                      DEFENDANT

CLASS ACTION COMPLAINT
JURY TRIAL DEMANDED

<u>**FIRST AMENDED COMPLAINT**</u>

Plaintiffs Mary Sayago, Leonardo Sayago, and Cynthia Lewis, acting individually and on behalf of all other persons similarly situated, for their First Amended Complaint and demand for jury trial, state and allege as follows:

## I.      INTRODUCTION

1.      Wells Fargo engages in a pattern and practice of demanding that borrowers maintain excessive flood insurance.

2.      The motive for this scheme is to force-place as many borrowers as possible with flood insurance through Wells Fargo's associated insurance providers that charge exorbitant premiums, and which, on information and belief, pay a kickback or commission to Wells Fargo's designated affiliate for acting as "broker" for the insurance sales.

3.      Premiums for force-placed policies with Wells Fargo's associated insurance companies are significantly more costly than premiums for identical policies purchased on the open market.

1

4.      In effectuating this commission generating scheme, Wells Fargo sends letters to borrowers falsely indicating that their mortgages or federal law require them to maintain these excessive levels of flood insurance and authorize Wells Fargo to force-place flood insurance on their properties if they fail to do so. .

5.      This is a lie.

6.      Federal law requires borrowers in flood zones to carry flood insurance equal to the *minimum* of either: (1) the outstanding balance on their loan; (2) the replacement value of the property, or (3) $250,000.  Put another way, as it relates to this case, federal law *never* requires a borrower to carry flood insurance coverage in excess of the principal balance of their loan.

7.      Many mortgages such as Plaintiff Cynthia Lewis's mortgage, bar Wells Fargo from ever requiring more than the federal minimum amount of flood insurance. Some mortgages, such as Plaintiffs Mary and Leonardo Sayago's mortgage, purport to give Wells Fargo discretion to set the amounts of insurance.

8.      Flood insurance equal to the principal balance of the mortgage fully protects Wells Fargo's interests because if there is a flood loss, Wells Fargo gets its loan repaid in full from the insurance proceeds.  This is why federal law does not require coverage in excess of the loan balance.   So it is wrong for Wells Fargo to require more. This is true whether it is strictly forbidden by the contract, as with Ms. Lewis, or whether it is a discretionary matter, as with the Sayagos' mortgage.  A party to a contract abuses its discretion when it exercises that discretion in bad faith.   There is no reasonable or good faith explanation for Wells Fargo demanding that Plaintiffs secure flood insurance coverage exceeding their mortgage balances.  Wells Fargo knew this.  But Wells Fargo

2

has, nonetheless, forced Plaintiffs and class members to spend unnecessary sums to maintain flood insurance in excessive and unnecessary amounts.

9.     Wells Fargo victimized Plaintiff Cynthia Lewis with these practices.  Her mortgage requires her to maintain the federal minimum amount of insurance. Approximately ten years after purchasing the home, Wells Fargo notified Cynthia Lewis that her home was in a flood zone.  At that time, the balance of Cynthia Lewis's note with Wells Fargo was approximately $50,000.  Wells Fargo, however, wrongfully forced Cynthia Lewis to obtain coverage in the amount of $137,000, which was both costly and unnecessary, by misrepresenting to her that the increased amount was required by federal law.   These false representations were made to her through standard form letters sent to other borrowers under the same circumstances.

10.     Wells Fargo victimized Plaintiffs Mary Sayago and Leonardo Sayago with these practices.  At all times relevant to this action, they carried adequate protection under their flood insurance policy.  In fact, the Sayagos chose to carry flood insurance protection in the approximate amount of $194,000 to cover an amortizing loan with Wells Fargo with an approximate balance of $161,000.  Wells Fargo forced the Sayagos to obtain $9,000 in additional coverage, for total coverage of $203,000.   Yet Wells Fargo's interests would have been 100% protected with coverage equal to the loan balance of $161,000.

11.     Wells Fargo was aware or should have been aware that the amount of coverage that it forced the Plaintiffs to obtain was contrary to federal law, unnecessary, and extremely costly to the borrower.

12.     Nonetheless, Wells Fargo sent the Plaintiffs Mary Sayago, Leonardo

Sayago, and Cynthia Lewis form letters explaining that they had to provide proof of flood insurance equal to the replacement cost of their homes, or Wells Fargo would purchase the insurance for them.  Wells Fargo's letters to the Sayagos stated that this was the amount "required by Wells Fargo Home Mortgage."  Wells Fargo's letters to Cynthia Lewis indicated that this was the amount required by federal law.  Ultimately, the Plaintiffs were forced to purchase the unnecessary and excessive coverage at the wrongful direction and coercion of Defendant to avoid force-placement in an exceedingly expensive flood insurance policy with Wells Fargo's associated flood insurance provider.

13.     Wells Fargo engages in a nationwide practice of forcing its borrowers to obtain flood insurance on property in excess of what is required by federal law and in excess of what is necessary for Wells Fargo to protect its interest in the collateral.

14.     If the borrower fails to purchase and maintain the demanded flood insurance coverage, Wells Fargo force-places them into overpriced flood insurance policies and pockets a commission on the exceedingly high premium.

15.     These actions constitute a breach of the mortgage contract between the property owners and Wells Fargo because Wells Fargo is imposing a condition not required by any reasonable construction of the mortgage provisions requiring Plaintiffs and class members to carry flood insurance on their property.  Wells Fargo's actions also constitute a breach of the implied covenant of good faith and fair dealing applicable to contracts.  Wells Fargo's actions are unconscionable, and violate the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*

16.     This Amended Complaint seeks compensation for Plaintiffs and class

4

members for all damages incurred as a result of Wells Fargo requiring flood insurance in excess of the outstanding principal balance of their loans  These damages include, but are not limited to, all insurance premiums paid to third parties for excessive insurance required by Wells Fargo, all insurance premiums paid to any insurance company for excessive force-placed flood insurance on behalf of Wells Fargo's borrowers, all kickbacks or commissions paid to Wells Fargo or any company affiliated with it for providing brokerage services for force-placed insurance policies, penalties under 15 U.S.C. § 1601, *et seq.*, an injunction prohibiting Wells Fargo from misrepresenting federal flood insurance requirements and from requiring unnecessary flood insurance policies on properties that already have adequate flood insurance as dictated by federal law, declaratory relief, and attorneys' fees and costs*.*

## II.    PARTIES

17.    Cynthia Lewis owns a home in Tampa, Hillsborough County, Florida.  She financed her home with a mortgage that was purchased and serviced by Wells Fargo.  She obtained excessive and unnecessary flood insurance for her property after Wells Fargo sent her letters falsely stating that federal law required her to maintain replacement cost coverage for her home.  Cynthia Lewis asks the Court to appoint her as class representative as more fully set out below.

18.    Mary Sayago is a resident of Tampa, Hillsborough County, Florida.  She financed her home with her husband, Leonardo Sayago, with a mortgage that was purchased and serviced by Wells Fargo.  She obtained excessive and unnecessary flood insurance for her property after Wells Fargo sent her letters falsely stating that her mortgage required her to maintain replacement cost coverage for her home and forced

her into a temporary flood insurance plan with excessive coverage limits.  Mary Sayago asks the Court to appoint her as class representative as more fully set out below.

19.     Leonardo Sayago is a resident of Tampa, Hillsborough County, Florida. He financed his home with his wife, Mary Sayago, with a mortgage that was purchased and serviced by Wells Fargo.  He obtained excessive and unnecessary flood insurance for his property after Wells Fargo sent him letters falsely stating that his mortgage required him to maintain replacement cost coverage for his home and forced him into a temporary flood insurance plan with excessive coverage limits.  Leonardo Sayago asks the Court to appoint him as class representative as more fully set out below.

20.     Defendant Wells Fargo Bank, N.A. does business in Florida and several other states throughout the United States.  Wells Fargo Bank, N.A. is the successor to Wells Fargo Mortgage, Inc., which no longer exists.  As recently as December 9, 2010, Wells Fargo continued to do business as Wells Fargo Home Mortgage.

21.     Defendant Wells Fargo's principal place of business is 420 Montgomery Street, San Francisco, California 94163.  Wells Fargo has conducted business in Florida at all times relevant to this action.  Service is proper upon its registered agent Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.

### III.     JURISDICTION AND VENUE

22.     Substantial acts giving rise to the causes of action asserted herein occurred in this State and within this venue.

23.     Jurisdiction over all federal causes of action pled herein is proper in this Court pursuant to 28 U.S.C. § 1331.  Plaintiffs' claims for violations of the Federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, constitute federal questions.

6

24.     Jurisdiction over all state law causes of action pled herein is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiffs are citizens of the State of Florida.  Other class members are citizens of States other than Florida.  Wells Fargo is a citizen of a State other than Florida, as its main offices are located in San Francisco.  The amount in controversy exceeds $5,000,000.

25.     Jurisdiction over all state law causes of action pled herein is also proper in this court pursuant to 28 U.S.C. § 1367.  All causes of action pled herein "are so related…that they form part of the same case or controversy under Article III of the United States Constitution."

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' action, and a substantial part of the property that is the subject of this action, are located in this District.  All class representatives reside in Tampa, Florida and the property securing their mortgages is located in Tampa, Florida.

## IV.    FACTS

### a.    As to Plaintiff Cynthia Lewis

27.     On March 23, 1998, Plaintiff Cynthia Lewis financed the purchase of her property with a mortgage provided by Island Mortgage Network.

28.     Wells Fargo subsequently purchased the mortgage and has acted as servicer for the mortgage since the time of assignment.  Wells Fargo is an assignee of Cynthia Lewis's mortgage and is subject to all obligations of the Lender under the mortgage and all duties of a lender under the Truth in Lending Act, 15 U.S.C. § 1601, *et seq*.

7

29.    A copy of Cynthia Lewis's mortgage is attached to this Amended Complaint as **Exhibit 1**.

30.    Cynthia Lewis's mortgage is a Federal Housing Administration mortgage, meaning that it is written on forms prepared by the Federal Housing Administration.  All such mortgages contain identical language regarding flood insurance.

31.    Paragraph 4 of the mortgage contains information relating to the borrower's obligation to maintain insurance.

32.    Paragraph 4 contains two separate clauses dictating dollar amounts of insurance coverage the borrower must maintain, one for "any hazards, casualties, and contingencies, including fire," and a separate clause for flood insurance.

33.    The "any hazards" clause states:

Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires.

34.    The any hazards clause excludes any reference to flood insurance.

35.    The flood insurance clause states:

Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by flood to the extent required by the Secretary.

36.    Paragraph 4 also contains a clause guaranteeing that Wells Fargo will be repaid the entire principal balance of the loan in the event of a flood loss.  It states, in relevant part:

In the event of a loss…[a]ll or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in Paragraph 3, and then to

prepayment of principal, or (b) to the restoration or repair of the damaged property…Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

37.     Paragraph 4 of Cynthia Lewis's mortgage establishes that (1) the Secretary of Housing and Urban Development determines the amounts of flood insurance necessary for the property, and (2) the Lender may always elect to use insurance proceeds to pay off the mortgage such that its interest is always protected as long as the insurance amount covers the amount of the mortgage.

38.     Flood insurance is specifically excluded from the general discussion of hazard insurance and is only discussed in a separate clause that explicitly gives the determination of the obligatory amount of flood insurance to the Secretary of Housing and Urban Development.

39.     Cynthia Lewis's mortgage obliges her to maintain flood insurance only in the amounts "**required"** by the Secretary—not the amounts encouraged, condoned, or allowed by the Secretary.

40.     The Secretary of Housing and Urban Development sets flood insurance requirements for FHA mortgages at the principal balance of the mortgage: "**Dollar Amount of Flood Insurance Coverage.**  For loans, loan insurance or guarantees, the amount of flood insurance coverage need not exceed the outstanding principal balance of the loan."   http://www.hud.gov/offices/cpd/environment/review/floodinsurance.cfm (last visited October 31, 2011)(emphasis in original).

41.     Cynthia Lewis was not required to maintain more flood insurance than the principal balance of her loan.

42.     At the time of closing the loan, Cynthia Lewis's house was not located in a

9

Special Hazard Flood Area and, so, did not need to carry any flood insurance.

43.     On August 28, 2008, the Federal Emergency Management Agency amended its maps, and this amendment placed Cynthia Lewis's home in a Special Flood Hazard Area, meaning she then had to meet the Secretary's minimum flood insurance requirements according to the terms of her mortgage.

44.     On September 30, 2008, Wells Fargo sent Cynthia Lewis a letter stating that she needed to obtain flood insurance.  This letter misrepresented the amount of flood insurance Cynthia Lewis needed to obtain.

45.     This letter stated that "The National Flood Insurance Reform Act of 1994 requires Wells Fargo Home Mortgage and all other mortgage companies that service home loans to inform their customers about their obligation to buy flood insurance" and that Cynthia Lewis "must have flood insurance that provides replacement cost coverage" for her home.

46.     This is a misrepresentation of federal flood insurance requirements and of Cynthia Lewis's mortgage's flood insurance requirements.

47.     Federal law requires Cynthia Lewis to maintain flood insurance equal to the principal balance on her mortgage—no more.

48.     Cynthia Lewis's mortgage incorporates this minimum standard as the amount of flood insurance she must maintain.

49.     In 2008, the amount of flood insurance the Secretary required for Cynthia Lewis's home was approximately $50,000, the principal balance owed on all liens and debts secured by her property.

50.     The only amount of flood insurance Wells Fargo could require under the

plain terms of Cynthia Lewis's mortgage was this amount "**required**" by the Secretary—$50,000.

51.    Although Cynthia Lewis has not maintained comprehensive records of all communications with Wells Fargo, on information and belief, discovery will demonstrate that Wells Fargo's letters stated that Wells Fargo would force-place coverage on Cynthia Lewis's property if she did not obtain the excessive flood insurance Wells Fargo demanded.

52.    Faced with paying a high-premium force-placed flood insurance policy through one of Wells Fargo's affiliates, Plaintiff Cynthia Lewis contacted her insurance agent and its flood insurance carrier and purchased the excessive coverage in the amount of $137,000, approximately $87,000 more flood insurance than her mortgage or federal law required her to maintain.  This amount was the replacement cost of Cynthia Lewis's property as determined by her insurance agent.

53.    Today, Wells Fargo continues to require Cynthia Lewis to maintain replacement cost flood insurance coverage for her home, despite the fact that the maximum required flood insurance for her home is her loan's principal balance, which is $47,925.34 as of June 9, 2011.

54.    After Cynthia Lewis purchased flood insurance from her insurance agent, Wells Fargo debited the annual premium for the flood insurance policy from her escrow account.  Cynthia Lewis continues to pay her flood insurance premiums through her mortgage escrow account.

55.    Wells Fargo knows or should have known that the proper amount of coverage required should have been the amount of the loan balance, which is $89,000

11

less than the amount of insurance they require Cynthia Lewis to maintain today.  Wells Fargo imposed identical or similar wrongful excessive flood insurance requirements on thousands of members of the proposed Classes, some of which undoubtedly resulted in Wells Fargo force-placing and profiting from expensive and unnecessary coverage through its affiliated insurance brokers, such as Wells Fargo Insurance, Inc.

56.     Cynthia Lewis initially paid $268.00 for her flood insurance policy in 2008. The annual premium for 2011 is $317.00.  The annual premium for the proper amount of flood insurance coverage required by the Secretary of Housing and Urban Development—$47,925.34 in 2011—would not have exceeded $120.  Cynthia Lewis, like other class members, suffered damages through being required to obtain and pay for flood insurance she did not need and was not legally required to carry.

### b.     As to Plaintiffs Mary Sayago and Leonardo Sayago

57.     On January 19, 2007, Plaintiffs Mary Sayago and Leonardo Sayago refinanced their property with a mortgage provided by PFG Loans, Inc.

58.     On information and belief, Wells Fargo was responsible for dictating the underwriting requirements for the loan to the originator, including confirmation that the property carried the requisite amount of flood insurance.

59.     A copy of the Sayagos' mortgage is attached to this Complaint as **Exhibit 2**.

60.     Mary and Leonardo Sayago's mortgage is a Fannie Mae/Freddy Mac Florida Uniform Instrument, meaning that all uniform covenants within it were written by Fannie Mae and Freddie Mac.  All such mortgages contain identical language relating to insurance requirements for the property securing the mortgage.

61.   Paragraph 5 of the mortgage contains information relating to the borrower's obligation to maintain flood insurance and the lender's right to "force-place" flood insurance.  It states, in relevant part:

> **5.   Property Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that lender requires.
> …
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense…[S]uch coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.
> …
> [A]ny insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened…If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess, if any, paid to Borrower.

62.   This "insurance clause" establishes that (1) Wells Fargo determines the amount of flood insurance necessary for the property, (2) any force-placed insurance policy may be no more than necessary to "cover Lender," and (3) insurance coverage that is insufficient to repair or restore the home will be paid first to repay the loan, with any overages paid to the homeowners.

63.   Plaintiff's mortgage was assigned to Wells Fargo concurrently with the execution of the original mortgage on or about February 3, 2007.

64.   At the time of closing the loan, Wells Fargo required, and the Sayagos provided to the closing lender, a certificate of insurance to make sure the loan complied

with Wells Fargo's requirements and the requirements of federal law, including the requirement of adequate flood insurance coverage.

65.     On December 9, 2010, Wells Fargo sent Mary Sayago and Leonardo Sayago a letter stating that they needed to obtain additional flood insurance equaling the replacement cost value of their home or Wells Fargo would force-place replacement cost value flood insurance on their property.

66.     The December 9, 2010 letter indicated that the "replacement cost" of the home is to be "determined by you and your insurance agent".

67.     On December 9, 2010, Mary Sayago and Leonardo Sayago maintained flood insurance in the amount of approximately $194,000.

68.     This amount, $194,000, was the replacement cost of the Sayagos' home for purposes of flood insurance, as determined by the Sayagos and their insurance agent.

69.     On December 9, 2010, Mary Sayago and Leonardo Sayago had a mortgage loan balance of approximately $161,000.

70.     On January 31, 2011, Wells Fargo sent Plaintiffs another letter indicating that, because they had not purchased increased flood insurance, Wells Fargo had purchased a temporary insurance policy in the form of an insurance binder in the amount of $9,000 for an annual premium of $83.75.   This letter states that Wells Fargo would convert the "insurance binder" into an annual insurance policy by purchasing a one year insurance policy on the Sayagos' behalf if they did not provide proof of "adequate insurance" within 30 days.

71.     This January 31, 2011 letter appears to ignore Wells Fargo's December 9,

14

2010 letter's assertion that replacement cost is to be "determined by you and your insurance agent" and, instead, imposed a different replacement cost than that determined by the Sayagos and their insurance agent—namely $203,000 instead of the $194,000 determined as replacement cost by the Sayagos and their insurance agent.

72.     After receiving these communications from Wells Fargo, the Sayagos contacted their insurance agent.  The insurance agent contacted Wells Fargo and, on information and belief, informed Wells Fargo that the Sayagos had adequate insurance for their property.  On information and belief, Wells Fargo responded that they required $9,000 in additional insurance.

73.     Faced with paying for a high-premium force-placed flood insurance policy through one of Wells Fargo's affiliates, Plaintiffs Mary Sayago and Leonardo Sayago purchased the excessive increased coverage, bringing their total flood insurance amount to $203,000.

74.     Wells Fargo debited the premium for this flood insurance policy from the Sayagos' mortgage escrow account.  The Sayagos continue to pay this increased premium through increased mortgage payments necessary to fund the escrow account.

75.     This Amended Complaint alleges that the Sayagos' mortgage does not authorize it to require insurance in excess of the loan balance, and certainly not in excess of the replacement value determined by the Sayagos and their insurance agent.

76.     Wells Fargo is entitled to require flood insurance and set the amount of required flood insurance under the Sayagos' mortgage; however, Wells Fargo must set that requirement in good faith.  Wells Fargo knows or should have known that the proper amount of coverage required should have been the amount of the loan balance,

which was approximately $42,000 less than the amount of flood insurance Wells Fargo required the Sayagos to obtain.

77.     Wells Fargo imposed identical or similar wrongful excessive flood insurance requirements on thousands of members of the proposed Classes, some of which resulted in Wells Fargo force-placing and profiting from expensive and unnecessary coverage through its affiliate, Wells Fargo Insurance, Inc., as discussed below.

78.     As a result of Wells Fargo's wrongful actions, the Sayagos have paid $41.00 in additional flood insurance premiums since December of 2010.

## V.     WELLS FARGO'S PRACTICES

79.     Wells Fargo services mortgages located in federally designated Special Flood Hazard Areas (SFHAs).

80.     Wells Fargo engages in a practice of requiring homeowners with Wells Fargo-serviced mortgages secured by properties located in SFHAs to maintain flood insurance coverage equal to the lesser of (1) their hazard insurance coverage, or (2) the $250,000 federal maximum amount of flood insurance.

81.     Wells Fargo applies this policy across all borrowers without regard to what their mortgages actually require or allow Wells Fargo to require.

82.     Wells Fargo represents to homeowners that this requirement is dictated in their mortgage or mandated by the federal government.

83.     In reality, federal law only mandates flood insurance coverage equal to the lesser of (1) the principal balance of the mortgage, (2) the insurable value of the property (i.e. the replacement cost), or (3) $250,000.

84.    Mortgage terms differ, as discussed below, but large numbers of Wells Fargo mortgages, including all Federal Housing Administration Mortgages, do not give it authority to require more insurance than the minimum amount required by the Secretary of Housing and Urban Development.

85.    The Secretary of Housing and Urban Development requires no more than the principal balance remaining on the mortgage secured by the property.

86.    No mortgage gives Wells Fargo the right to set insurance amounts in bad faith.

87.    When Wells Fargo determines that a borrower whose loan is secured by property located in a SFHA does not maintain replacement cost coverage, it sends the borrower a letter indicating that the borrower must obtain flood insurance equal to their replacement cost value up to a maximum of $250,000, or Wells Fargo will purchase flood insurance on the borrower's behalf.  These letters state that either the federal government or the borrower's mortgage requires this amount of insurance.

88.    These letters back Wells Fargo's borrowers into a corner by forcing them to either purchase the unnecessary and excessive coverage or do nothing and let wells Fargo force-place flood insurance on their property.

89.    If the borrower does not purchase the requested insurance, Wells Fargo purchases flood insurance on the borrower's behalf from an affiliated insurance provider, which, on information and belief, then pays a kickback or commission to a designated Wells Fargo subsidiary or sister company that supposedly provides some sort of brokerage service for the insurance sale.

90.    As a result, where borrowers are either unable or unwilling to secure the

17

unnecessary and excessive flood insurance coverage, Wells Fargo, or its parent company's insurance broker subsidiaries, reaps unfair financial gain from its customers.

91.     These brokerage commissions are determined, according to general practice in the industry, as a percentage of each force-placed policy's annual premium and are paid to the broker of Wells Fargo's choice—which is always a subsidiary of Wells Fargo's holding company—regardless of whether the "broker" provided any brokerage services.   Therefore, the higher the premium, the higher the commission Wells Fargo's sister corporations receive.   This creates a perverse incentive for Wells Fargo to (1) force-place as many insurance policies as possible (2) with whatever company charges the highest premium.[1]

92.     The Sayagos and Cynthia Lewis were victims of the first phase of this scheme; Wells Fargo required excessive flood insurance on their mortgages to increase the number of force-placed policies.   They escaped the second phase of this scheme by purchasing their own flood insurance to avoid force-placement at an exorbitant premium.

93.     Wells Fargo's affiliated insurance provider charges insurance premiums that are at least twice the cost of obtaining the same insurance from an independent insurance company, even though those insurance policies, as described in Wells Fargo's own letters, provide limited coverage as compared with independently written insurance policies.

94.     Wells Fargo is aware or should be aware that the required amount of flood insurance on improved property is the lesser of the loan amount, replacement value, or

---

[1] In 2010, Congress took the first step toward eliminating this perverse incentive with the Dodd-Frank Act by amending the Real Estate Settlement Procedures Act to require that all charges for force-placed insurance be "bona fide and reasonable."

$250,000.

95.     Insuring property to the least of these three amounts completely protects any interest Wells Fargo has in the property to the greatest extent allowed by law, and it is improper for Wells Fargo to demand more.

96.     For example, if the mortgage balance is less than the replacement value of the property securing the loan, Wells Fargo's interest is fully protected in the event of a loss if the property is insured for the amount of the mortgage balance because Wells Fargo can simply accept any insurance proceeds as repayment of the entire loan.  If the loan balance is greater than the replacement value of the property securing the loan, coverage equal to the replacement value fully protects Wells Fargo's interest in the event of a loss because the insurance will pay to completely replace the mortgage collateral.

97.     Federal law does not mandate that Wells Fargo require more insurance than a borrower's loan balance, and Wells Fargo faces no penalties if it requires flood insurance coverage equal to the mortgage balance for every borrower.

98.     Wells Fargo requires all borrowers to maintain replacement cost coverage, regardless of their loan balance, for one reason: Wells Fargo will force-place any borrower who is unable or unwilling to obtain the demanded insurance coverage with its affiliated insurance provider, which will pay a kickback to Wells Fargo's parent company's "insurance broker" subsidiary.

99.     Wells Fargo's generic demand notices to Plaintiffs and members of the proposed Classes misstate flood insurance requirements under federal law and the borrower's mortgages.

100.   On information and belief, the vast majority of mortgages that Wells Fargo services are uniform security instruments produced either by Fannie Mae and Freddie Mac, or by the Federal Housing Administration.

101.   Federal Housing Administration security instruments always state "Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by flood to the extent **required** by the Secretary." **Exhibit 2**, **¶ 4** (emphasis added).   This is the only sentence in FHA loans that addresses flood insurance requirements, and it delegates absolutely no discretion whatsoever to Wells Fargo or any lender to determine the amount of flood insurance to maintain for the property.   It explicitly states that the borrower must maintain only the amount of insurance **required**—not the amounts allowed, encouraged, or condoned— by the Secretary of Housing and Urban Development.

102.   The "required" amount under the National Flood Insurance Program is the lesser of (1) the principal balance of the mortgage, (2) the replacement cost of the property, or (3) $250,000.

103.   The Secretary of Housing and Urban Development sets flood insurance requirements for FHA mortgages at the principal balance of the mortgage: "**Dollar Amount of Flood Insurance Coverage.**   For loans, loan insurance or guarantees, the amount of flood insurance coverage need not exceed the outstanding principal balance of the loan."   http://www.hud.gov/offices/cpd/environment/review/floodinsurance.cfm (last visited October 31, 2011)(emphasis in original).

104.   Fannie Mae/Freddie Mac uniform security instruments always state that insurance shall be "in the amounts (including deductible levels) and for the periods that

20

lender requires." This purports to give Wells Fargo discretion to determine the amounts of insurance. As with all contractual terms, this provision is not without limits. Obviously, wells Fargo could not require a property owner to carry two million dollars in insurance coverage on a home with a replacement cost of $250,000. There would not even be an insurable interest in connection with the excess coverage. Yet Wells Fargo's practice and policy is different only in degree. Wells Fargo regularly requires property owners, like Plaintiffs, to carry flood insurance coverage far in excess of their loan balance. To the extent that Wells Fargo sought to impose coverage requirements beyond those necessary to protect its interest (the minimum of the amount of the loan or the replacement value of the home), Wells Fargo breached its contract with Plaintiffs and all similarly situated owners whose loans Wells Fargo services.

105.  Wells Fargo's policies convert what may be an advisable decision for its borrowers—insuring the borrower's entire interest in the property—into a mandatory requirement. It converts the federal maximum insurance amounts into a minimum requirement for its borrowers. In the case of FHA mortgages, this is a plain willful breach of an express term of the contract. In the case of Fannie Mae/Freddy Mac mortgages, it is also a breach of contract because when a contract allows a party discretion to act, unreasonable or bad faith abuse of that discretion is a breach of contract. Moreover, given Wells Fargo's financial incentives to force-place as many flood insurance policies as possible, it is an abuse of the National Flood Insurance Act.

106.  Wells Fargo forces borrowers to obtain unnecessary flood insurance coverage in excess of that required by federal law and the borrowers' mortgages. If the borrowers do not obtain the coverage, Wells Fargo forces them into policies with high

premiums, and companies affiliated with Wells Fargo receive the premiums and the broker commissions.  Alternatively, class members have the option of purchasing lower cost, but still unnecessary, flood insurance from a third party to avoid lining Wells Fargo's and Wells Fargo's affiliates' pockets.

107.    On information and belief, discovery will reveal other direct and indirect financial benefits and incentives that accrue to Defendant as a result of their unfair, unlawful, and unconscionable conduct as set forth above.

## VI.    THE NATIONAL FLOOD INSURANCE PROGRAM AND REGULATIONS

108.    Flood insurance is backed and regulated by a federal program called the National Flood Insurance Program (NFIP), established pursuant to the National Flood Insurance Act (NFIA).

109.    Under the NFIP, federal regulatory agencies, most notably the Federal Emergency Management Agency (FEMA), establish flood zones (called SFHAs), and proscribe minimum and maximum limits on how much insurance a homeowner can have and how much the insurance policy will pay in the event of a loss.

110.    The NFIA authorizes mortgagees to require flood insurance for properties located in SFHAs and gives them the power to force-place flood insurance on borrowers whose loans are secured by properties within SFHAs.

111.    Mortgagees are required to make sure that properties securing their mortgages are insured up to the federal minimum levels, equal to the lesser of (1) the maximum insurance coverage available through the NFIP, which is $250,000 for an individual dwelling, (2) the outstanding balance of a traditional mortgage loan or total available line of credit for HELOCs, or (3) the replacement cost of the unit.

112.   The <u>maximum</u> amount of flood insurance, the most the NFIP will pay in the event of a loss due to flooding, is the lesser of (1) the $250,000 NFIP limit, or (2) the "insurable value" of the building, which is the replacement cost.   The NFIP will never pay any benefits beyond insurable value.

113.   Wells Fargo's policy is to require that borrowers maintain this maximum amount of flood insurance, the most the NFIP will pay in the event of a loss due to flooding.  This policy converts the maximum insurance amounts into minimum requirements for Wells Fargo borrowers.

114.   Wells Fargo misrepresents to its customers that federal law requires them to obtain the maximum amount of flood insurance under the NFIP.   In reality, this requirement is entirely a fabrication of Wells Fargo because the NFIA does not require coverage in excess of the loan balance.  Wells Fargo forces homeowners to purchase flood insurance greater than this minimum requirement under the law.   If homeowners do not obtain this costly and unnecessary coverage, Wells Fargo force-places them into even more costly flood insurance policies and takes a commission for its sister companies.

**VII.    CLASS ALLEGATIONS**

*a.    Proposed Class Definitions*

115.   Plaintiffs bring this action on behalf of themselves and all others similarly situated.  Plaintiffs ask the Court to certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

116.   This action satisfies the Rule 23 requirements of numerosity, typicality, commonality, adequacy, and superiority, as set out more fully below.

23

117.   Plaintiffs assert their claims for breach of contract (Count 1), violation of the Truth in Lending Act (Count 2), unconscionability (Count 3), and unjust enrichment (Count 4) on behalf of a proposed nationwide class defined as follows:

> **Proposed Nationwide Flood Insurance Class:**  All persons who have or had a loan or line of credit with Wells Fargo secured by residential property in the United States whom Wells Fargo, its affiliates, or its agents required to purchase or maintain, or on whose behalf Wells Fargo purchased "lender placed" or "force-placed", flood insurance coverage on their property in excess of their total outstanding loan balance (if a traditional loan) or maximum line of credit (if a home equity line of credit).

118.   Excluded from the proposed Classes are Defendant, Plaintiffs' counsel, and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

### b.     Numerosity

119.   The Putative Classes are so numerous that joinder of all Class members is impracticable.   Thousands of Wells Fargo customers satisfy the Putative Class definitions, and the identity of all Class members can be ascertained from Wells Fargo's records.

### c.     Typicality

120.   The claims of the representative Plaintiffs are typical of the claims of proposed class members, as demonstrated by, *inter alia*, the following facts:

a.   The Plaintiffs' loans and mortgage documents were typical of those of other class members;

b.   The form flood insurance notice letters Plaintiffs received were typical of those form notice letters received by other class members;

c.   Defendant's treatment of Plaintiffs, in accordance with Defendant's uniform policies and practices, is consistent with Defendant's treatment of other class members;

    d. Defendant's practice of requiring borrowers to purchase and maintain flood insurance coverage exceeding the balances on their loans or total authorized credit on their HELOCs is a common wrong as to all class members; and

    e. Defendant and its affiliates typically accepted kickbacks, commissions, or other compensation in connection with lender-placed flood insurance policies when class members did not purchase additional coverage.

    121.   Defendant's flood insurance requirements are the same for all borrowers, regardless of individual circumstances, and Defendant's form letters informing borrowers of these requirements are the same or substantially similar for all borrowers.

### d.    *Commonality*

    122.   Common questions of law and fact exist as to all members of the proposed class and predominate over any questions solely affecting individual members of the class.

    123.   Common questions of law and fact, include, but are not limited to:

    a. Whether federal law requires Defendant's customers to purchase and maintain flood insurance coverage exceeding the principal balance of their loan or total authorized credit under a HELOC;

    b. Whether the common loan and mortgage documents that Defendant relies upon clearly, conspicuously, adequately, and meaningfully disclose the amount of flood insurance that Defendant requires of customers, and whether the loan and mortgage documents authorize Defendant to demand and/or force-place flood insurance coverage exceeding the principal balance of their loan or total authorized credit under a HELOC;

    c. Whether Defendant's form letters to borrowers misrepresent the applicable federal flood insurance requirements;

    d. Whether Wells Fargo violated the Truth in Lending Act by failing to accurately disclose customers' flood insurance requirements, and by changing its flood insurance requirements after-the-fact and without proper notice or consent;

    e. Whether Defendant breached the mortgage contracts with class members by demanding unauthorized amounts of flood insurance or amounts that were not properly or adequately disclosed in the contracts;

f.  Whether Defendant owes its customers a duty a good faith and fair dealing, and if so, whether Defendant breached this duty by, *inter alia*, (i) demanding flood insurance in amounts greater than necessary to secure the amount of funds extended and greater than agreed to by the parties at the time of the contract; and (ii) obtaining kickbacks, commissions, or other compensation for themselves and their affiliates in connection with lender-placed flood insurance policies that were purchased through affiliate entities rather than at arm's length;

g.  The appropriateness and proper form of declaratory or injunctive relief for the common benefit of class members; and

h.  The appropriateness and proper measure of compensatory damages, statutory damages, restitution, and/or other monetary relief.

### e.    *Adequacy of Class Representatives*

124.    Representative Plaintiffs will fairly and adequately protect the interests of the Putative Class members.  They were victimized by the same common scheme perpetrated by Defendants and suffered the same harms as members of the class.  The representative Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in complex class action litigation, particularly class actions brought on behalf of consumers against financial institutions.

### f.    *Superiority*

125.    This case is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to all class members, such that final injunctive relief is appropriate to the class as a whole.

126.    Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the class predominate over any questions affecting only individual class members.

127.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Defendant's conduct arises out of common and uniform flood insurance policies and practices, resulting in unnecessary flood insurance premiums and related charges that are easily calculable from Defendant's records and other class-wide evidence.

128.   Plaintiffs and class members could not realistically attempt to pursue separate individual actions against Defendant because the amount of each individual claim is small compared to the complexity and expense of individual prosecution, especially due to Defendant's financial resources.  Plaintiffs are unaware of any similar claims against Defendant by any class members individually.

129.   Plaintiffs and class members have suffered the harms alleged in this Amended Complaint as a result of Defendant's fraudulent, deceitful, unlawful, and unfair practices. Absent a class action, class members will continue to suffer losses, Wells Fargo will continue to violate the law as described herein, Wells Fargo will be permitted to retain the proceeds of its deceptive and misleading business practices, and Wells Fargo's misconduct will continue without remedy.

130.   Class certification will aid the Court as well, in that a class action will prevent the need for duplicative litigation that would significantly increase the time and expense to all parties and the Court.  Individual litigation would also create the potential for inconsistent or contradictory rulings concerning Defendant's practices.

131.   Management of this case as a class action presents far fewer difficulties than individual litigation.  A class action will protect the interests of justice and judicial efficiency, because it allows claims to be heard that might otherwise remain unheard

due to the relative expense of individual lawsuits and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## VIII. CAUSES OF ACTION

132. Based on the facts as set forth above, Plaintiffs assert, on behalf of themselves and all others similarly situated, the following causes of action:

### *Count 1: Breach of Contract*

133. Plaintiffs restate and reallege the preceding paragraphs of the Complaint as though set out here word for word.

134. As assignee of Cynthia Lewis's and the Sayagos' mortgages, Wells Fargo was the "Lender" under these contracts and owed Plaintiffs all obligations delegated to the Lender under the mortgage notes and security instruments.

135. Separate Plaintiff Cynthia Lewis's contract with Wells Fargo requires that she maintain flood insurance coverage against "loss by flood to the extent required by the Secretary." It does not authorize Wells Fargo to demand any flood insurance in excess of the minimum requirements of the Secretary of Housing and Urban Development.

136. Wells Fargo expressly breached paragraph 4 of its contract with Cynthia Lewis by (1) requiring more coverage than required by the Secretary of Housing and Urban Development and NFIP regulations, and (2) misrepresenting that such excess coverage was required by federal law.

137. Separate Plaintiffs Mary Sayago and Leonardo Sayago's contract with Wells Fargo authorized Wells Fargo to force-place insurance sufficient to "cover Lender."

138.   Wells Fargo's letters to the Sayagos and the insurance binder Wells Fargo purchased for the Sayagos expressed an intent to force-place coverage far in excess of the amount necessary to "cover Lender."  This constitutes a breach of contract, because the mortgage did not authorize Wells Fargo to require or force-place more coverage than necessary to "cover Lender."

139.   On information and belief, Wells Fargo purchased force-placed or lender placed insurance policies on behalf of thousands of class members, and the coverage amounts for those policies far exceeded the amount necessary to "cover Lender."  This constitutes a breach of contract.

140.   The Sayagos' contract with Wells Fargo requires that the Sayagos must maintain flood insurance coverage "in the amounts and for the periods that Lender requires."  This is a discretionary term.  When a term of a contract affords one party unilateral discretion on a matter, abuse of that discretion is a breach of contract.  Wells Fargo abused its discretion under the contractual provision noted by requiring flood insurance in excess of that necessary to fully protect its interests.  This was a breach of contract.

141.   In addition to its breach of the contractual terms as described above, Wells Fargo's actions also constitute a breach of the contractual duty of good faith and fair dealing to Plaintiffs and class members by, among other things: (1) demanding and threatening to force-place more flood insurance than required by federal law or the relevant mortgage documents; (2) misrepresenting the amount of flood insurance that Plaintiffs and other class members were required to maintain on their property; (3) imposing contractual requirements that did not exist or that exceeded the requirements

29

disclosed in the relevant contracts; and (4) forcing Plaintiffs to purchase unnecessary additional coverage, which well exceeded federal guidelines and the coverage amounts necessary to protect Wells Fargo's collateral interest.

142.   On information and belief, Wells Fargo has replicated these actions with respect to all Wells Fargo customers who own real estate in the United States.

143.   As a result of Defendant's breach of both the implied covenant of good faith and fair dealing and the express contract terms, Plaintiffs and class members have been injured, and have suffered actual damages and monetary losses in the form of increased insurance premiums, interest payments, escrow charges, other charges, and unnecessary burdens on their property rights.

144.   Plaintiffs and class members are entitled to recover compensatory damages and any other appropriate relief resulting from Wells Fargo's wrongful actions in breach of their mortgage and HELOC contracts.

### Count 2: Violation of the Truth in Lending Act
### (15 U.S.C. § 1601 *et seq.*)

145.   Plaintiffs restate and reallege the preceding paragraphs of the Complaint as though set out here word for word.

146.   Plaintiffs' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

147.   Wells Fargo is a "creditor" as defined by the Truth in Lending Act (TILA).

148.   Wells Fargo was required to accurately and fully disclose the terms of the legal obligations between the parties.

149.   Wells Fargo violated this requirement under the TILA by (i) failing to clearly, fully, and accurately disclose its flood insurance requirements in its mortgages, and (ii) misrepresenting in its flood insurance notices that Plaintiffs were obligated to maintain flood insurance in amounts greater than required by federal law, greater than authorized in the deeds of trust, and greater than necessary to protect its interest in the property securing the mortgages.

150.   In addition, Wells Fargo violated the TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgages; and failing to provide any notice, after origination, that Wells Fargo was amending the terms of the credit plans as described in the mortgage deeds of trust and mortgage notes, *see* 12 C.F.R. § 226.9(c).

151.   With respect to Mary and Leonardo Sayago, all events occurred within the one year period preceding the filing of this complaint, and so, occurred within the TILA's limitation period.

152.   Cynthia Lewis's TILA claims are subject to equitable tolling of the statute of limitations in the TILA.   As alleged in paragraph 45-48 above, Wells Fargo fraudulently concealed that it had changed the terms of Cynthia Lewis's loan by falsely representing that federal law, not Wells Fargo, required her to maintain more flood insurance than her loan balance.  Due to this fraudulent concealment, Cynthia Lewis did not discover that the new flood insurance requirement resulted from Wells Fargo unilaterally changing the terms of her loan, instead of from changes in the federal regulatory environment as Wells Fargo's letters suggest.  Wells Fargo's active fraud to

Cynthia Lewis tolls the TILA's statute of limitations until the filing of this Amended Complaint.

153.    Wells Fargo systematically engaged in similar violations of the TILA to the detriment of other members of the class.

154.    Plaintiffs and members of the class have been injured and have suffered a monetary loss arising from Wells Fargo's violations of the TILA.

155.    As a result of Wells Fargo's TILA violations, Plaintiffs and members of the class are entitled to recover actual damages and a penalty of $500,000.00 or 1% of Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

156.    Plaintiffs and members of the classes are also entitled to recovery of attorneys' fees and costs to be paid by Wells Fargo, as provided by 15 U.S.C. § 1640(a)(3).

### Count 3: Unconscionability

157.    Plaintiffs restate and reallege the preceding paragraphs of the Complaint as though set out here word for word.

158.    Florida courts recognize unconscionability as both an affirmative defense to contract formation and a cause of action for egregious wrongs in contract formation and performance.

159.    The doctrine of unconscionability is an equitable doctrine that provides a remedy when a party with superior bargaining power dictates unfair and unreasonable terms in a contract on a take-it-or-leave-it basis and when the superior party's performance of the contract is unreasonable so that it "shocks the conscience" of the court.

160.   Wells Fargo's conduct described herein is both procedurally and substantively unconscionable in the following respects, among other things:

a) Wells Fargo is undoubtedly in a superior position with respect to its mortgage and HELOC contracts.  Wells Fargo is in a position to know and understand federal flood insurance requirements.  For this reason, Wells Fargo customers reasonably rely on Wells Fargo's representations regarding flood insurance requirements under federal law and the mortgage contracts.

b) Wells Fargo dictated the terms of Plaintiffs' and other class members' mortgage and HELOC contracts, including the flood insurance provision, which, in the case of Fannie Mae and Freddie Mac mortgage instruments such as the Sayagos, purport to give Wells Fargo unfettered discretion in dictating flood insurance requirements.

c) Wells Fargo misrepresents the amount of flood insurance that federal law requires homeowners to maintain and forces customers to purchase unnecessary and additional coverage, subject to the threat of high cost force-placed insurance with a Wells Fargo affiliate.  These actions leave the consumer helpless:  Wells Fargo's actions force the homeowner to choose to either (1) pay for unnecessary and additional insurance or (2) resist or do nothing and watch Wells Fargo force-place a high cost policy on the property with one of its affiliates.

d) When the homeowner does not or cannot obtain the unnecessary additional coverage, Wells Fargo force-places the coverage through one of its affiliates or partners, who charge premiums as much as four times the going rate for

coverage that is substantially more limited than comparable flood insurance that the homeowner could purchase from an independent insurance company.

e) Wells Fargo has no plausible explanation for forcing borrowers to purchase unnecessary and additional flood insurance coverage because Plaintiffs and class members already had coverage that was adequate under federal law and that was sufficient to cover Wells Fargo's interest in the collateral.

161.   Wells Fargo's mortgage provisions and actions are unconscionable considering (1) Wells Fargo's great business acumen and experience in relation to Plaintiffs and class members; (2) the substantial disparity in the parties' relative bargaining power; (3) the inconspicuous and incomprehensible nature of the contract language involved; (4) the oppressiveness of the terms and Wells Fargo's application of them; (5) the commercial unreasonableness of the contract terms; (6) the purpose and effect of the terms; (7) the allocation of risk between the parties; and (8) public policy concerns.

162.   The mortgage and HELOC agreements are unconscionable because they allow Wells Fargo to exercise complete discretion in dictating terms of flood insurance requirements, which are contrary to federal law, the mortgage and HELOC contracts themselves, and the parties' understanding at the time they entered into the contracts.

163.   Plaintiffs and class members whom Wells Fargo forced to purchase excessive unnecessary flood insurance coverage are entitled to rescission and restitution as a result of Wells Fargo's unconscionable policies and practices.

### *Count 4: Unjust Enrichment*

164.   Plaintiffs restate and reallege the preceding paragraphs of the Complaint as though set out here word for word.

165.   Wells Fargo was unjustly enriched by its business practice of requiring excessive flood insurance and force-placing all class members who did not obtain the excessive flood insurance coverage in high-premium flood insurance policies with the flood insurance provider of its choosing.

166.   Wells Fargo's designated flood insurance provider(s) charged premiums far in excess of the market rate for flood insurance.

167.   After purchasing these exorbitantly priced flood insurance policies for its borrowers, Wells Fargo withdrew the premiums directly from its borrowers' escrow accounts.

168.   On information and belief, a portion of these exorbitant premiums was used to pay Wells Fargo, or its holding company's subsidiary, a kickback, or commission, for acting as "broker" for the insurance sale.

169.   On information and belief, neither Wells Fargo nor any subsidiary of its holding company provided any traditional brokerage services in connection with the force-placed insurance policy sales.  They did not earn the commission.

170.   Wells Fargo was unjustly enriched by receiving these commissions.

171.   Wells Fargo was unjustly enriched by withdrawing force-placed insurance premiums and brokerage commissions directly from borrowers' mortgage escrow accounts, both by its immediate receipt of the escrowed funds and in the form of fees

charged to borrowers who were unwilling or unable to pay increased mortgage payments resulting from their reduced escrow account balances.

172.   As a result of Wells Fargo's actions that constitute unjust enrichment, class members suffered actual damages for which Wells Fargo is liable.  Wells Fargo's liability for unjust enrichment damages should be measured by the extent of Wells Fargo's unjust enrichment, including enrichment of its partners, affiliates, and related corporations—through which Wells Fargo benefitted.

## IX.    DAMAGES

173.   Defendant should pay damages to the class in an amount to be determined after trial by jury, but in any event, in excess of five million dollars ($5,000,000).

## X.    INJUNCTIVE RELIEF

174.   Defendant should be enjoined from: requiring borrowers to obtain flood insurance in amounts exceeding the outstanding balances on their loans or total authorized credit on a line of credit; from sending notices to borrowers tending to mislead borrowers into believing that flood insurance amounts requested by Wells Fargo are required by federal law when that is not the case; and from force-placing flood insurance with Wells Fargo subsidiaries, partners, or affiliates.

## XI.    DEMAND FOR JURY TRIAL

175.   Plaintiffs, on behalf of themselves and all others similarly situated, demand trial by a jury on all issues so triable.

WHEREFORE, Plaintiffs pray that the Court certify this case as a class action and allow Plaintiffs to pursue the claims and relief described hereinabove on behalf of

themselves and all others similarly situated; that the Court certify the class identified above; that Plaintiffs be awarded the maximum amount of damages allowed by applicable law; for a trial by jury on all issues so triable; for attorneys' fees, costs, and all other appropriate relief.

Dated this 2nd day of November, 2011.


Respectfully Submitted,

**Attorneys for Plaintiffs**

By: /s/ Davy Carter

Russell D. "Davy" Carter, III (*pro hac vice*)
CARTER WALKER, PLLC
Post Office Box 628
Cabot, AR 72023
(501) 605-1346
(501) 605-1348 (facsimile)
dcarter@carterwalkerlaw.com

-and-

Kevin McLaughlin (FL Bar No.0085928)
WAGNER, VAUGHAN & McLAUGHLIN, P.A.
601 Bayshore Boulevard, Suite 910
Tampa, FL 33606
(813) 225-4000
(813) 225-4010 (facsimile)
Kevin@Wagnerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing:

Michael K. Winston
E-mail: mwinston@carltonfields.com
David B. Esau
E-mail: desau@carltonfields.com
**CARLTON FIELDS, P.A.**
525 Okeechobee Blvd., Suite 1200
West Palm Beach, Florida 33401

*Attorneys for Defendant Wells Fargo Bank, N.A.*

/s/ Davy Carter